# THE KOHALA SUGAR COMPANY *v.* JAMES WIGHT.

APPEAL BY DEFENDANT FROM DECISION OF THE COMMISSIONER OF WATER RIGHTS FOR THE DISTRICT OF KOHALA, ISLAND OF HAWAII.

SUBMITTED ON BRIEFS, NOVEMBER 23, 1898.    DECIDED JANUARY 18, 1899.

JUDD, C.J., FREAR AND WHITING, J.J.

Upon a petition to a Commissioner of Water Rights alleging title in certain water by prescriptive use, that it was diverted by defendant and praying for an injunction to prevent its further diversion, it was not competent for the Commissioner to award one-half of the water in controversy to petitioner. Such decision is not responsive to the prayer. Held, that the weight of evidence does not sustain the petitioner's right to the use of the water sufficiently in order to authorize the injunction. Controverted Water Rights in the lands of Halawa and Halaula, North Kohala, Hawaii, discussed.

OPINION OF THE COURT BY JUDD, C.J.

The controversy in this case, having been for some years a matter of discussion between the parties, culminated on the 5th of October, 1897, by an action before the Commissioner of Water Rights wherein the plaintiff, an Hawaiian Corporation, declares and says that defendant, James Wight, M. D. of Halawa, North Kohala, Hawaii, "within the three years last past without right and against the right of the plaintiff, has cut off

and diverted the flowing water from a certain ancient water ditch or auwai, extending from or near a place called 'Kupunao-kane' in or near the upper part of 'Halawa' in said Kohala, or has taken out from time to time portions of the water flowing therein or that would in course flow therein; to which flow unobstructed and in undiminished quantity the plaintiff is and has for long over twenty years been entitled. And plaintiff prays that such acts and doings by defendant may be ordered to cease; that said water may be restored to such auwai or ditch, and the defendant may be directed not to molest or interfere therewith."

The Commissioner sat twenty-two days hearing the oral testimony taken at Kohala on both sides. To complete the case, depositions of several witnesses, who were unable to come before the Commissioner, were received. Witnesses were also examined before a clerk of this Court in Honolulu by consent, and considerable documentary evidence was filed. The Commissioner rendered his decision on the 4th of April, 1898, in which he found that the plaintiff had acquired the right to the water in controversy by prescription and awarded one-half of the water from the "Kupunaokane" water head to the plaintiff.

This decision is on its face wrong. It is not responsive to the prayer of the plaintiff. The complaint alleges plaintiff's title to the water by prescription, its diversion by defendant, and asks for an injunction to prevent its further diversion. It does not pray that the rights of both parties to the water in controversy be settled and apportioned. There is, moreover, no evidence in the record leading to the conclusion that plaintiff is entitled to half the water, and presumably, that defendant is entitled to the other half. A careful examination of the whole record discloses that the issue was whether the plaintiff had by visible, adverse, continuous and hostile use of the water for twenty years and over, acquired an exclusive right to it, and it seems to us that the injunction should either have been granted or refused accordingly as the Commissioner found that the title of the plaintiff had been established or not.

We have carefully read the recorded testimony consisting of

over 600 pages. The most of it is from Hawaiians, generally aged persons. It is somewhat indefinite as to dates of the actual conditions of the water ditches, heads and springs of water in the localities of the disputed water, and its use at the time, as observed by the witnesses. But references to the dates of terms of office of the successive managers of the Kohala Sugar Co. (plaintiff) have rendered much testimony approximately certain as to the dates of the use of the water as testified to by the respective witnesses.

A great deal of the testimony is "hearsay," being statements made to witnesses by their parents or grandparents, which, though presumably admissible in a case of this character and not objected to on either side, should be carefully weighed.

Several facts are conceded to exist, to wit: That E. G. Hitchcock (deceased) was manager of the Kohala Sugar Co., from its inception early in 1863 to the end of 1863. There followed the below mentioned managers in the order given, with the dates of their respective incumbencies: G. W. Wilfong (now deceased) from December, 1863, to October, 1865; D. D. Baldwin, from 1865, to November, 1872; G. C. Williams (now deceased) from 1872 to June, 1881; Chapin (now deceased) from June, 1881, to March, 1893, when George Renton was appointed and held to the date of the decision. It is also perfectly well settled and conceded by both parties that the water head in controversy is called "Kupunaokane" and that it is situated in the land called "Halawa" owned by the defendant. "Kupunaokane" appears to be a hole in which water from a large extent of swampy ground above it collects. It is not strictly a "spring" in the sense that it is water coming perennially to the surface from invisible subterranean sources. We, however, call it a "spring." In time of drouth its water diminishes greatly in amount, though it is less affected by drouth than any other sources of water in the vicinity. The natural flow of water from this spring by gravity and undirected by man, would be down into the main ravine of the land of "Halawa." This main ravine or gulch is full of kalo patches made and cultivated in

ancient times. These patches were unquestionably supplied with water from the "Kupunaokane" source and they used all the water in pre-historic times. The limitation of time and space make it inadvisable to describe in detail the topography of all this portion of the country; only such as is essential to the understanding of the case will be given.

Kamehameha I., the final conqueror of this entire group of islands, was born here and his ancestral domain was this part of the island,—Kohala. It included the land of "Halawa" and the land of "Halaula" adjoining, upon which the plaintiff's plantation is situated. It is quite certain that some time in the early part of this century, Kamehameha, who was an enterprising, energetic chief, had the cove at the sea-coast end of Halaula enlarged, had houses put up in the flat land adjoining, and some large kalo patches dug and planted thereon and led water to them in land owned or controlled by plaintiff, from the "Waianaea" gulch by an artificial ditch called "Pohakea."

Tradition is indistinct whether any of this kalo was ever ripened or whether more than one crop was taken off. The failure of this enterprise is generally traceable to the insufficiency or, perhaps, cessation, of the water supply. The site of these patches is called "Keawaeli," which means the "Dugout, or excavated, harbor." The contention of the plaintiff is that Kamehameha supplemented the water supply from the "Pohakea" ditch by water led to Pohakea ditch from "Kupunaokane," their junction being called "Piauwai." A large part of the testimony offered by plaintiff tends to show by tradition that this was the case; and that "Kupunaokane" water actually came down to "Keawaeli."

This may have been the case, but when we consider that Kamehameha owned Halawa and its main gulch was full of kalo patches, and that all the "Kupunaokane" water was needed for them it is improbable that he would have taken its water to Halaula, except for a temporary purpose, since the land from which the water was taken by the "Pohakea" ditch, had in those days a plentiful supply of water, amply sufficient to sup-

ply all its kalo land, much less in extent than that of Halawa valley. But it does not seem to us that the fact of Kamehameha using Halawa water on Halaula was the inception of an adverse use in favor of Halaula as the dominant estate. He owned both lands and until Halaula and Halawa had separate owners, no adverse use of the water could be in favor of one land against the other.

The main questions remaining upon which evidence was adduced, were (1st), At what time did the user of the "Kupunaokane" water by the plaintiff begin and continue; and (2d), Was the use as of right or by permission of the defendant; and (3rd), Was the plaintiff's user interrupted.

On the first inquiry, we have to reconcile, if possible, the apparently contradictory depositions of the late E. G. Hitchcock and of D. D. Baldwin. Hitchcock says he took charge of the Kohala Sugar Company in January, 1863, and remained as manager about one year; that in May, 1863, when water was short he sent up men to clean out the water head of Kupunaokane or "Halawa water," and the ditch leading to where it joins the Pohakea ditch and used the water for natural and domestic purposes; but he confesses that his recollection of the water heads was dim and he might not be able to point them out now, as he had not visited them since, and then only once, during the year of his management. Baldwin says that in 1865 and previously, the water supply of plaintiff's plantation was the "Pohakea ditch," but in 1867, a time of drouth, the water was insufficient and he made search for water in consequence of information of a ditch that Kamehameha I. had made to lead water to his kalo patches at "Keawaeli," and he found traces of a ditch above Waianuhea's house, not very distinct until about half a mile above his house, when it was more distinct in places, and he had it cleaned out and let water flow down from Kupunaokane, and by digging a new ditch in places led it into the "Pohakea" ditch. The use of the Kupunaokane water was only occasional and in dry times, and for milling and domestic purposes only. His impression is that the ditch be-

tween Kupunaokane and Pohakea ditch had not been used for a long time, probably from Kamehameha's time until opened by him; that none of the laborers who were there in Hitchcock's time or Wilfong's time knew of the Kupunaokane, now called the "Kamehameha ditch," until a luna got hold of an old native who told him of it; that he asked no permission from Dr. Wight, and had no opposition to his use of the water, and expected none. It is to be remembered that Dr. Wight was a large owner in plaintiff's plantation and a Director also.

We feel obliged to take the Baldwin statement as more likely to be the fact. Hitchcock was manager only one year, and before plaintiff's mill was erected or had use for much water, and he admits very little knowledge or recollection of the topography of the country. Baldwin had five years' residence there and needed the water for the mill. Hitchcock very likely supposed that some little water that flowed from Waianuhea's land into the Pohakea ditch from above (mauka of) the spot where the Kupunaokane afterwards entered the Pohakea ditch was the water direct from Kupunaokane. It is not improbable that, after thirty-four years' absence he confused the two.

Dating from 1867, when, as we find, the occasional use of the Kupunaokane water, when required by plaintiff, began, its period of use must have continued at least to 1887, to complete the term of twenty years. There is abundance of testimony from Hawaiian witnesses that the plaintiff used Kupunaokane water continuously during all this period and later. But Dr. L. S. Thompson says that he, from 1879 to 1885, used the entire "Halawa water," that is, that came from Kupunaokane, for fluming cane from land in Halawa leased by him of Dr. Wight, to the Halawa mill, and this without permission of or objection by the plaintiff.

This, if true, would interrupt the plaintiff's continuity of use. But it is contended that open and adverse use of the water by the plaintiff as of right, whenever he required it, though not a daily or continuous use would not interrupt the running of the statute of limitations. This is true as a general proposition,

but it is inconceivable that for six years, when both Halawa and Kohala (Halaula) mills were grinding cane, a right to water alleged to be the property of and necessary to the latter should be used by the former without demur.

R. H. Atkins, District Magistrate of Kohala, and son-in-law of Dr. Wight, says that in taking off the crops of 1872 and 1875 he used *all* the Halawa or Kupunaokane water for mill purposes; this was while Halawa mill was turned by water power. The next year they put in steam power and did not need to use so much water.

Mr. A. Sunter who was on plaintiff's plantation during the management of Baldwin and Williams, having oversight of plaintiff's cane fields, says, acknowledging his memory to be imperfect, he has no recollection of water being taken from Halawa over to plaintiff's plantation while he was there employed and thinks he would have known of it if this had been the case.

Mr. C. B. Wells, manager of Halawa plantation from February, 1880, to June, 1889, says he used nearly all the Kupunaokane water, but left enough for Kohala Sugar Company's water pipes, which he allowed upon request of Mr. C. A. Chapin, who was plantation manager from 1881 to 1893. The date of the permission is not given.

H. S. Rickard says that while employed under Mr. Chapin on the Kohala Sugar Company's plantation, he, in 1887 (the plantation's supply of water being short), under directions from Mr. Chapin, dug a ditch and made a short flume and took the water from Kupunaokane for plaintiff's use, and used it for one month; that this action was strongly objected to by the kalo raising, Halawa natives, and Mr. Chapin stationed a man at the waterhead to regulate the supply so that the Halawa kalo should not suffer.

A large number of the Hawaiian witnesses called by plaintiff say that they went out to the Kupunaokane waterhead only once in their lives, but then they saw the water running from

it to the Pohakea ditch, fixing the time of the visitations as being under the early managers of the plaintiff's plantation.

It may be said as applicable to many of the Hawaiian witnesses called by both sides respectively, that they were badly shaken by cross-examinations and their statements show efforts to be too precise as to details that would not ordinarily be remembered. This induces us to be cautious as to placing too much reliance upon this testimony.

One thing we find to be proved—that the Kupunaokane water was situated in and appurtenant to the land of Halawa and popularly speaking "belonged" to its owners, and to the holders of the kalo patches within its boundaries, for it is conceded that ancient kalo patches have acquired easements in the water for their sustenance.

. It is recited by defendant, and sustained by other evidence that some time in the fifties, a man named Sweet, called by the natives "Kuene" (steward), dug a small ditch from Kupunaokane to irrigate land occupied by him within the land of Halaula and used the same for cultivation and for domestic purposes. By some legal process instigated by defendant in behalf of himself and the kalo patch holders of Halawa, Sweet was stopped and his water ditch stopped too, and the water continued to flow to Halawa. This story is not rebutted. Its legal significance is that Dr. Wight asserted his right to the water for use in Halawa soon after acquiring a portion of it in 1851.

The evidence that the use of the Halawa water by plaintiff was by permission of Dr. Wight, is conflicting. That permission was asked of and granted by Dr. Wight is strenuously asserted by the Doctor and denied by Mr. Baldwin and other managers. We have come to the conclusion that as the Doctor was greatly interested in the plaintiff's plantation he acquiesced in the occasional use of his water by it, not intending that the plaintiff should thereby acquire a right to it.

This is supported by testimony that when the water was so used and the native holders of kalo patches in Halawa com-

plained to the Doctor that their kalo was suffering he pacified
them by urging them to be patient, and "bye and bye they
would have the water again."

The strongest bit of evidence in favor of the permissive use
of the water by plaintiff is the admissions by the late Rev. E.
Bond in his correspondence with the agents of the plaintiff's
plantation at Honolulu. He was the former owner of the land
of "Halaula" and its grantor to the plaintiff, and had a large,
if not controlling interest in the plaintiff corporation, and was
the local Director.

The most important letter of Mr. Bond is that of August 14,
1885. It states: "In regard to the water of which you speak,
you are, I think, correct, with this important modification; the
water did not and never has belonged to Dr. Wight; it *belonged
to the land of Halawa,* of which at that time Dr. Wight owned
some 200 acres out of say a total of 1,200 or 1,500 acres. He
had rights in common with others and *these he allowed the
Company to use at the time."* (Dr. Wight acquired this 200
acres of Halawa by deed of Kamehameha III. dated 2d Sep-
tember, 1851.) And from time to time thereafter he acquired
nearly all of the land of Halawa.

This admission of Mr. Bond's being against his interest is
strong evidence.

Manager Chapin (now deceased) in his letter of August
5th, 1885, says when discussing with plaintiff's Treasurer at
Honolulu the advisability of renting to Dr. Wight some "Aina-
kea" water of plaintiff's to use on his ranch on land other than
Halawa, advises the lease at the nominal rental of $100 per
year, *"for past favors from the Doctor in the water line."*
This can only mean such water as the Doctor (defendant) con-
trolled and that this was the Halawa water is now undisputed.
These "favors in the water line," the Commissioner in his de-
cision thinks refer to water from "Aamakao" or other water.
It becomes necessary to explain this "Aamakao" water. De-
fendant had sold to plaintiff a wood lot of 500 acres of the land
of "Aamakao" from which plaintiff cut the firewood and

flumed it to its plantation with "Halawa" water. Moreover, if the land of Aamakao had water appurtenant to it, it passed to the grantee, and it cannot be said to have been a "favor" by Dr. Wight to allow grantee to use it. Counsel on both sides admit in substance that "past favors" does not refer to Aamakao water, but to Kupunaokane water. (See page 610 of record.)

The plaintiff company at first based its right to use a portion of the Kupunaokane water for milling and domestic purposes by reason of its having acquired some tracts of kalo land in the ravine of Halawa. Manager Williams in a letter dated January 3, 1888, says: "In my letter of yesterday I forgot to answer about Halawa water. The water that Baldwin used to run down wood was from Dr. Wight's land, but K. S. C. (plaintiff) has two rights to that water on the same stream below," naming the "Pio" land acquired by plaintiff, and another piece below, bought later and described as being the "land leased to Chapin in 1879."

This claim to the Halawa-Kupunaokane water as being a right to such portion of it as was appurtenant to the parcels of land in Halawa bought by the plaintiff, is inconsistent with the claim made by plaintiff in his petition that the right to the entire Kupunaokane water was acquired for the land of Halaula by adverse use immemorially and for more than twenty years.

We find that the present claim was not made until Chapin's time.

We do not refer to a lease of Dr. Wight's Halawa water with many restrictions and conditions to the plaintiff company made June 30, 1890, as it seems to have been a compromise adjustment of the water controversies between the parties without waiving certain rights claimed by plaintiff, and its covenants are not alleged in this case to have been breached by defendant.

Nor do we here discuss what proportion of the Kupunaokane water plaintiff is entitled to (if any) by reason of its ownership of kalo land in Halawa. As above said the Commissioner was not called upon or authorized by the pleadings to ascertain the amount of water to which each party is entitled.

Many more points made by counsel on the evidence might be commented upon, but we have discussed the evidence sufficiently to show that the right now claimed by plaintiff is not sustained by the weight of evidence. This should be the case in order to authorize the Court to issue an injunction to deprive the defendant of the use of the water from the Kupunaokane water head. In order to authorize an injunction the plaintiff's right must be clearly proved.

The judgment of the Commissioner is vacated and the complaint of the plaintiff dismissed. Costs to follow judgment.

*W. R. Castle* and *P. L. Weaver* for plaintiff.

*Kinney & Ballou*, for defendant.