McBRYDE SUGAR COMPANY, LIMITED, Plaintiff-Appellant, Cross-Appellee, *v.* AYLMER F. ROBINSON, et al., Defendants-Appellees, Cross-Appellants.

NO. 4879

DECEMBER 20, 1973

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE OGATA IN PLACE OF KOBAYASHI, J., DISQUALIFIED

*Per Curiam*. Subsequent to the filing of the decision in this case on January 10, 1973 (54 Haw. 174, 504 P.2d 1330 (1973)), petitions for rehearing were filed by some of the parties. By order of this court dated June 18, 1973, all the parties were requested to file supplementary briefs directed to the issues (1) whether HRS § 7-1[1] was material to the determination of the water rights of the parties, and (2) whether owners of parcels of land in the Hanapepe Valley, who were entitled to appurtenant water rights for taro raising at the time of the Mahele or the Land Commission Award, were entitled to apply the appurtenant water rights to parcels of land other than that to which the court found the right was appurtenant.

Arguments of the parties were heard at the rehearing had on September 18, 1973. After careful consideration of the briefs and arguments presented at the rehearing, we find no reason to change the decision filed herein.

*J. Russell Cades* and *Robert B. Bunn (Cades, Schutte, Fleming & Wright* of counsel) for McBryde Sugar Co., Ltd., plaintiff-appellant, cross-appellee.

*John H. R. Plews (Anthony, Hoddick, Reinwald & O'Connor* of counsel) for Selwyn A. Robinson, et al., defendants-appellees, cross-appellants.

*Andrew S. O. Lee*, Deputy Attorney General *(George Pai*, Attorney General, of counsel) for State of Hawaii, defendant-appellee, cross-appellant.

*William F. Quinn (Goodsill, Anderson & Quinn* of counsel) for Olokele Sugar Co., Ltd., defendant.

*Clinton Shiraishi (Shiraishi & Yamada* of counsel) for Ida Albarado, et al., petitioners.

DISSENTING OPINION OF MARUMOTO, J.

This phase of the case is limited to two points mentioned

---

[1] The pertinent portion of HRS § 7-1 reads:

". . . . The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use."

in the foregoing per curiam, the points being: first, whether HRS § 7-1 was material to the determination of the water rights of the parties, and, second, whether the landowners in Hanapepe Valley, who were entitled to appurtenant water rights, had the right to divert such appurtenant water to watersheds beyond the Hanápepe Valley.

I discussed my view on the second point in my dissent reported at 54 Haw. 201, 504 P.2d 1356, and it is the view presented in the supplementary briefs with more elaboration.

I did not discuss the first point in my dissent, for the reason that I did not think that it was an issue on appeal. However, assuming that it was a proper issue on appeal, I think that HRS § 7-1 does not support the holding of the court in Part II of the opinion of the court at 54 Haw. 180, 504 P.2d 1335, that it reserved the title to flowing water to the State for the common good. On the point, I concur in the historical analysis in the dissenting opinion of Mr. Justice Levinson.

DISSENTING OPINION OF LEVINSON, J.

Although I voted with the majority of this court in *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 504 P.2d 1330 (1973) [hereinafter referred to as *McBryde I*], I am constrained to recant that position in view of my current understanding of the problems of this case. In light of the arguments adduced on rehearing, historical evidence discovered upon further research subsequent to the court's previous decision in this case, and a reappraisal of the reasoning supporting that decision, it is my opinion that the court committed error in holding that all surplus water belongs to the State and that private water rights, however acquired, may not be transferred to nonappurtenant land. Because of the importance of this case to the development of the law on the subject of Hawaii's water resources, I have undertaken to present a detailed analysis explaining why *McBryde I* is not in keeping with long established and unique principles of Hawaiian water law. Precisely because *McBryde I* is such a radical departure from these principles as they have been heretofore understood, moreover, I have concluded that *McBryde I* effectuates an

unconstitutional taking of the appellant's and cross-appellants' property without just compensation and should be reversed on this ground as well.

As Mr. Justice Frankfurter stated in his famous dissenting opinion in *Henslee v. Union Planters National Bank*, 335 U.S. 595, 600 (1949): "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." I regret that the wisdom to correct the errors of *McBryde I* has not come to a majority of this court in time to restore continuity to the body of water law that has evolved in Hawaii over the course of more than a century.

## I. THE BACKGROUND OF THE CONTROVERSY

This case arises out of a controversy among owners of land located in the Hanapepe Valley on the island of Kauai respecting their relative rights in the surface waters of the valley.[1] The action commenced on March 24, 1959, when a complaint was filed by McBryde Sugar Company, Limited, hereinafter referred to as McBryde, the owner of the *ilis kupono*[2] of Eleele and Kuiloa, situated in the southeastern

---

[1] The uncontested findings of the trial judge below, sitting as Commissioner of Private Ways and Water Rights under HRS §§ 664-31 to 37, as to the nature of surface waters in the Hanapepe Valley were as follows:

The watershed of the Hanapepe River is about fifteen miles long and from two to five miles in width. At the upper or north portion the annual rainfall is between 400 and 500 inches. The annual rainfall decreases as the valley goes toward the sea, and at the sea the rainfall is comparatively negligible. The Koula stream joins the Manuahi stream about halfway to the sea to form the Hanapepe River.

McBryde Sugar Co. v. Robinson, S.P. No. 108, Decision at 4 (5th Cir. Ct. of Hawaii, December 10, 1968).

[2] The Hawaiian terms *ili kupono, ili, ahupuaa* and *kuleana* are peculiar to the ancient Hawaiian system of land tenure and were explained as follows in Territory v. Bishop Trust Co., 41 Haw. 358, 361-62 (1956):

[U]nder the ancient Hawaiian system all land belonged to the king or ruling chief who allotted tracts of land from time to time to the principal chiefs, subject to revocation at will; upon the death of the king each principal chief derived his lands anew, gave them out to an inferior order of chiefs or first of rank, by whom they were subdivided again and again from the king down to the lowest class of tenants.

The unit of land was the *ahupuaa*, usually running from the mountains to the sea. Within the *ahupuaa* were a number of subdivisions, each of which was

portion of the valley. The defendants fell into three cate-
gories: (1) the Territory (now the State) of Hawaii, the owner
of the *ahupuaa* of Hanapepe, located in the southwestern
portion of the valley; (2) the partnership of Gay and Robinson
and its individual partners, hereinafter referred to as Gay and
Robinson, owners of the *ilis kupono* of Manuahi and Koula,
located in the northwestern and northeastern portions of the
valley, respectively, and; (3) all other owners of the lands in
the Hanapepe Valley, hereinafter referred to as Small Own-
ers.

The two principal users of water in the Hanapepe Valley
are McBryde and Gay and Robinson, both of which for a long
period of time have availed themselves of substantial
amounts of the surface waters of the valley for sugar cane
irrigation both within and without the Hanapepe watershed.[3]
The instant controversy was kindled in 1949 when Gay and
Robinson implemented a greatly improved ditch and tunnel
system for the transportation of water for irrigation purposes

---

called an *ili* [or *ili* of the *ahupuaa*]. This division was for the convenience of the
chief, administered by a *konohiki* or agent appointed by the chief. (It is only in the
later statutes that the chiefs or landlords are referred to as *konohikis*.) It had no
existence separate from that of the *ahupuaa*, except the so-called *ili ku* [*ili
kupono*] or independent *ili*, although the independent *ili* paid tribute to the king.
There were also *kuleanas,* meaning a tract of land within the larger tract. The
term *kuleana* originally referred to a right of property in any business or other
matter but afterwards was applied to the land holding of the tenant or *hoaaina*
residing in the *ahupuaa*.

*See generally* J. CHINEN, THE GREAT MAHELE: HAWAII'S LAND DIVISION OF 1848, at
1-8 (1958); W. HUTCHINS, THE HAWAIIAN SYSTEM OF WATER RIGHTS 39-42 (1946)
[hereinafter cited as HUTCHINS].

On the facts of this case, although it is possible that the *konohiki* of the *ahupuaa*
of Hanapepe exercised plenary control over the entire Hanapepe Valley in ancient
times, at some point in history the king created fully independent *ilis kupono* within
the geographical boundaries of the *ahupuaa*. These *ilis kupono* were of equal rank
and dignity with the *ahupuaa* from which they were created, and upon their *kono-
hikis* devolved all the rights and appurtenances customarily associated with the
stewardship of such land units on behalf of the king. *See* Territory v. Gay, 31 Haw.
376, 378-81 (1930), *aff'd,* 52 F.2d 356 (9th Cir.), *cert. denied,* 284 U.S. 677 (1931).

[3] The evidence showed that McBryde had been appropriating water for irrigation
at least since 1934, *see* McBryde Sugar Co. v. Robinson, S.P. No. 108, Decision at
11-12 (5th Cir. Ct. of Hawaii, December 10, 1968), and that Gay and Robinson had
been doing so since 1891. *See id.* at 6-7. *See also* Territory v. Gay, 52 F.2d 356 (9th
Cir.), *cert. denied,* 284 U.S. 677 (1931), *aff'g* 31 Haw. 376 (1930).

to the lands at Makaweli, a substantial portion of which is cultivated by the Olokele Sugar Company, outside and to the west of the Hanapepe watershed. Although this system enabled Gay and Robinson to appropriate significantly increased amounts of water from the Koula stream, such an increase was to the detriment of downstream landowners such as McBryde who thereafter were unable to take from the Hanapepe River the amount of water they had theretofore been taking.

After an exhaustive trial on the merits, on January 30, 1969 the trial court filed amendments to its decision of December 10, 1968 delineating the rights of the parties with respect to appurtenant water,[4] prescriptive water,[5] normal surplus water,[6] and storm and freshet surplus water[7] in the Hanapepe Valley. The trial court's process of reasoning and conclusions in this regard are reported in *McBryde Sugar Co. v. Robinson, supra* at 176-77, 504 P.2d at 1333-34. Integral to the trial court's judgment were two principles of Hawaiian water law, which it considered to be solidly bottomed in Hawaiian judicial precedent and which were unquestioned by

---

[4] Appurtenant water rights have been defined as follows:

Whenever it has appeared that a kuleana or perhaps other piece of land was, immediately prior to the grant of an award by the land commission, enjoying the use of water for the cultivation of taro or for garden purposes or for domestic purposes, that land has been held to have had appurtenant to it the right to use the quantity of water which it had been customarily using at the time named.
Territory v. Gay, 31 Haw. 376, 383 (1930).

[5] As stated by Mr. Hutchins:

In order to establish a prescriptive title to a water right, there must have been an "actual, open, notorious, continuous and hostile use" of the water for the statutory period of limitations [(20 years), and t]he use must also have been made under a claim of right.
HUTCHINS 111; see Territory v. Gay, 31 Haw. 376, 383 (1930); Kohala Sugar Co. v. Wight, 11 Haw. 644, 648-50 (1899).

[6] Normal surplus water is all water in a stream or river "not required for the satisfaction of . . . prescriptive or . . . appurtenant rights," Territory v. Gay, 31 Haw. 376, 384 (1930), excluding only storm and freshet water as defined in note 7 *infra*.

[7] Storm and freshet surplus water is that amount of water above the normal flow of a stream or river which is intermittently caused by storm precipitation. *See* Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co., 15 Haw. 675, 680 (1904); HUTCHINS 74-77.

any of the parties: (1) that all normal surplus water belongs to the *konohiki* of the *ahupuaa* or *ili kupono* on which it originates, *see, e.g., Territory v. Gay,* 31 Haw. 376, 387-88 (1930), and; (2) that water rights however acquired are freely transferable to any land within or without the watershed on which they arose, so long as the water rights of others are not thereby deleteriously affected. *See, e.g., Wong Leong v. Irwin,* 10 Haw. 265, 270-72 (1896).

On appeal to this court by McBryde, the State, and Gay and Robinson, many issues were raised, including, among other things, the correctness of the trial court's adjudications of the quantum of appurtenant water rights of the parties, the amount of water, if any, to which McBryde was entitled by prescriptive use, and the proper disposition of storm and freshet surplus water. This court upheld the findings of the trial court with respect to the amount of appurtenant water belonging to the State, McBryde, and the Small Owners, *McBryde Sugar Co. v. Robinson, supra* at 187-89, 504 P.2d at 1339-40, and affirmed in part and reversed in part the findings of the trial court as to the amount of appurtenant water to which Gay and Robinson was entitled. *Id.* at 189-90, 504 P.2d at 1340. This court also reversed the finding below that McBryde had acquired title to over two million gallons of water per day by prescriptive use. *Id.* at 198, 504 P.2d at 1344-45.

At this point, however, this court departed radically in two major respects from the reasoning of the trial court and the positions taken by the various parties. First, it held that all surplus water in the State, including normal and storm and freshet surpluses,[8] is the property of the State and not the property of the *konohiki* of the *ahupuaa* or *ili kupono* on which the water originates. *Id.* at 180-87, 504 P.2d at 1335-39. This holding was grounded entirely on a specific portion of the Principles Adopted by the Board of Commissioners to Quiet Land Titles in Their Adjudication of Claims Presented to Them, adopted by the Land Commission on August 20, 1846 and approved by resolution in the Legislative Council

---

[8] *See* notes 6 and 7 *supra.*

on October 26, 1846, RLH 1925, Vol. II, 2124, 2128 (originally enacted as L. 1847, at 81, 85) [hereinafter cited as Land Commission Principles], which announced that the Mahele left unimpaired the king's power "[t]o encourage and even to enforce the usufruct of lands for the common good."[9] This provision, it was held, reserved to the king and, through subsequent governments, to the State, the control of all surplus surface waters in Hawaii for the common welfare of the Hawaiian people.

Second, this court held that section 7 of the Enactment of Further Principles, originally published as L. 1850, § 7, at 202, and presently compiled in HRS § 7-1,[10] codified the doctrine of riparianism as it existed in Massachusetts and England in the mid-nineteenth century, and that under that doctrine water rights acquired by virtue of ownership of lands along the bank *(ripa)* of a stream or river were appurtenant

---

[9] The court stated:

The principles specifically and most emphatically indicated that the Land Commission was only authorized to convey certain of the King's rights in land which had been bestowed upon individuals by him, to wit:

"[H]is private or feudatory right as an individual participant in the ownership, not his sovereign prerogatives as head of the nation. Among these prerogatives which affect lands are the following:
* * * *
"3rd. To encourage and even to enforce the usufruct of lands for the common good * * *."
* * * *
"These prerogatives, power and duties, his Majesty ought not, and ergo, he cannot surrender. Hence the following confirmations of the board and titles consequent upon them must be understood subject to these conditions." L. 1847, 85; RLH 1925, Vol. II, p. 2124, 2128.

54 Haw. at 185-86, 504 P.2d at 1338.

[10] That section provides:

Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. *The people shall also have a right to drinking water, and running water*, and the right of way. *The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple;* provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use.

(Emphasis added).

exclusively to those parcels of land and could not be transferred to remote parcels. 54 Haw. at 191-98, 504 P.2d at 1341-44.

Because the above two principles, if correct, would have precipitated a revolutionary change in the Hawaiian system of water rights as it has been understood heretofore, *see* HUTCHINS *passim,* the court decided that additional enlightenment with respect to its further adherence to them would be helpful. Accordingly, the court granted the petitions for rehearing sought by McBryde, Gay and Robinson and the Small Owners, and centered the inquiry around the following issues:

1.  The pertinent portion of HRS § 7-1, which was first enacted on August 6, 1850, Laws 1850, and which has been in our statute books ever since, reads:

> "The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use."

Is the foregoing statute material to the determination of the water rights of the parties in this case? If so, why, if not, why?

2.  The parties in this action introduced evidence, as the record shows, to show that parcels of land in the Hanapepe Valley were entitled to appurtenant water rights for raising taro at the time of the Mahele or the Land Commission Award. The trial court found certain parcels were entitled to appurtenant water rights. Under what principle or theory of law are the owners entitled to apply the appurtenant water rights to parcels of land other than that to which the court found the right was appurtenant?

## II. THE OWNERSHIP OF SURFACE RUNNING WATERS IN HAWAII

### A. *The Reasoning of* McBryde I

The only private rights to surface running waters in the Hanapepe Valley specifically acknowledged to the parties by

*McBryde I* are those referred to as appurtenant by that case and prior cases, *i.e.*, rights to the amount of water used for taro cultivation on specific plots of ground at or immediately preceding the time of Land Commission Awards.[11] *McBryde Sugar Co. v. Robinson, supra* at 187-90, 504 P.2d at 1339-40; *see* HUTCHINS 102-03 and cases cited therein.[12] All other water in the valley (surplus water), *McBryde I* held, belongs to the State.

The court's reasoning in this regard was based exclusively on language contained in the Land Commission Principles, RLH 1925, Vol. II, 2124, 2128 (originally enacted as L. 1847, at 81, 85).[13] The circumstances surrounding the adoption of the Land Commission Principles are detailed in *McBryde I*. 54 Haw. at 184-85, 504 P.2d at 1337-38. The only point needing reiteration here is that these measures were adopted by the Land Commission and approved by the Legislature for the purpose of providing the Land Commission with standards for the adjudication of private land titles following the Great Mahele of 1848, by which King Kamehameha III "proclaimed that he was sharing the lands in the Hawaiian Kingdom with his people." *McBryde Sugar Co. v. Robinson, supra* at 185, 504 P.2d at 1337-38.[14] It is true, as stated in *McBryde*

---

[11] Under *McBryde I*, although in theory the acquisition of private rights to water by *prescription* is still possible in Hawaii, the holding that all surplus water in a stream or river belongs to the State renders the establishment of such rights as a practical matter highly problematical since, as the court held, "one may not claim title to or interest in state-owned property by adverse use." 54 Haw. at 198, 504 P.2d at 1345. Prescriptive rights to water would be possible only in the case of a watercourse in which the surplus water amounts in quantity to less than the water prescribed. Where any surplus exists, *McBryde I* requires that the appropriator "cease prescribing the State's portion." *Id.* at 198, 504 P.2d at 1345. Title to the prescribed water in excess of the surplus water, if any, *presumably* would continue to be tested under traditional principles relative to the establishment of title to private property by prescription or adverse use. *See* note 5 *supra*.

[12] *See also* H. A. WADSWORTH, *A Historical Summary of Irrigation in Hawaii*, 37 THE HAWAIIAN PLANTERS' RECORD 124, 140 (1933) [hereinafter cited as WADSWORTH].

[13] The text of these Principles relied upon in *McBryde I* is set out at note 9 *supra*.

[14] *See generally* 1 R. KUYKENDALL, THE HAWAIIAN KINGDOM ch. XV (1938) [hereinafter cited as KUYKENDALL].

*I,* that the Principles acknowledged the reservation by the sovereign of the "prerogative . . . to encourage and even to enforce the usufruct of lands for the common good." But to say that the king retained the power to "encourage" and "enforce" the "usufruct" of land is not to say that, *ipso facto,* he retained title to all surplus water in his kingdom. For while it is true that in ancient times "the King was the sole owner of the water as he was the rest of the land," *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co.,* 15 Haw. 675, 680 (1904), the Land Commission was given the authority not only to confirm private allodial titles to land, but also to do so "in accordance with . . . native usages in regard to . . . *water privileges.*" RLH 1925, Vol. II, 2123 (originally enacted as An Act to Organize the Executive Departments of the Hawaiian Islands, L. 1846, Pt. I., ch. VII, art. IV) (emphasis added).

That one of the most important "usufructs" of land is the right to water cannot be doubted. *See McBryde Sugar Co. v. Robinson, supra* at 186 & n.12, 504 P.2d at 1338 & n.12. However, to maintain, as the court did, that since water is a "usufruct" of land, therefore it was retained by the king after the Mahele, is a fruitless line of analysis. For if all "usufructs" of land were retained by the king, then nothing but bare legal title was passed by the Mahele and subsequent Land Commission Awards — a proposition which is patently incorrect if not absurd. A more useful approach to the question of who owns the surplus waters in Hawaii is to examine into Hawaiian usage and judicial precedent for enlightenment. The Land Commission Principles, at best, are ambiguous on the point and in and of themselves do not support the court's position.

## B. *Ancient Hawaiian Usage*

The ancient Hawaiian system of water rights was elaborate and well-defined, built largely around the dependence of the Hawaiian people on taro cultivation. *See* E. S. HANDY & E. G. HANDY, NATIVE PLANTERS IN OLD HAWAII 57-67 (1972). Indeed, the Hawaiian word for law or regulation is

*kanawai,* a compound of the word *wai,* meaning water[15] — a relationship which suggests that many early unwritten laws pertained to the regulation of water rights.[16] *See* A. PERRY, A BRIEF HISTORY OF HAWAIIAN WATER RIGHTS 3 (1912).

Under ancient usage, the king owned all land and water in the kingdom. *See Territory v. Bishop Trust Co.,* 41 Haw. 358, 361 (1956). However, a grant by the king to a *konohiki* of an *ahupuaa* or an *ili kupono* carried with it not only the control of the land and the right to its products, but also the absolute right to control the disposition of surplus water. *See* HUTCH-INS 84-85. Although the *konohiki* was always subject to summary disseizin by the king, the bundle of rights and powers concomitant with the grant of such a parcel of land clearly included the legal right to surplus water and the power to use it however the *konohiki* saw fit. *See* A. PERRY, *supra* at 11. Because such rights and powers were historically associated with land tenure in ancient Hawaii, it is natural to assume that when King Kamehameha III engineered the Great Mahele in 1848, he intended to *mahele* not only his legal title to the land but also his legal title to surplus water originating on all land not retained by himself as Crown property. As stated by Professor Wadsworth:

> Patently [surplus] water belonged to the chief, at the pleasure of the King, and in all logic the legal ownership passed to the chief along with the ownership of land upon his completion of the legal requirements of the Mahele.

WADSWORTH 132. *See generally* 1 KUYKENDALL ch. XV.

## C. Hawaiian Judicial Precedent

The foregoing general historical observations are supported by a long line of Hawaiian judicial precedent. I under-

---

[15] M. PUKUI & S. ELBERT, HAWAIIAN-ENGLISH DICTIONARY 119 (3d ed. 1965), defines *kanawai* as: "Law, code, rule, statute; legal (perhaps so called because many early laws pertained to water [*wai*] rights)."

[16] For example, under ancient law, no dam could divert more than one-half of the water in a stream for irrigation. Moreover, the penalty for the malicious destruction of a lawful dam was death, the tamperer's body being used in repairing the damage to the dam by way of example. WADSWORTH 130. *See also* note 35 *infra.*

take to analyze this precedent here in order to point out more fully the errors of *McBryde I*.

*Peck v. Bailey*, 8 Haw. 658 (1867), was a controversy between landowners within an *ahupuaa* involving the right of one such landowner to make certain diversions of water from a river originating within the *ahupuaa* to dry *(kula)* land. Although the case specifically adjudicated only appurtenant water rights, the court observed, in dictum, that the conveyance by the king of land "bordering on [a] river will include the rights of water in said river, *which had not been before granted* [*i.e.*, surplus water]." *Id*. at 671 (emphasis added).

*Davis v. Afong*, 5 Haw. 216 (1884), involved a dispute over the right of a *konohiki* to appropriate running underground spring water which originated on his land. The court held that *konohiki* land awarded subsequent to the Mahele carried with it the right to the surplus spring water originating thereupon. However, the court's reasoning had more far-ranging implications. If private land grants pursuant to the Mahele included the right to running *spring* water (an important "usufruct" of the land), then it would seem that *a fortiori* the grants included the right to running surface water.[17]

In *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co.*, 15 Haw. 675 (1904), the court for the first time was faced squarely with the question of the ownership of surplus surface running water. The case involved a single *ahupuaa* that had been split in ownership between the complainant, as owner of the land in the *ahupuaa* in which a river originated, and the respondent, as owner of a large tract of *kula* land within the *ahupuaa*. At the heart of the suit were diversions by the respondent of all the surplus water from the river for the purpose of irrigating its *kula* land. The court held specifically that the grant to the respondent of the dry part of the

---

[17] The court indicated as much in dictum:

By the rules of ancient Hawaiian agriculture the konohiki patches would be entitled to water. And it is a general principle, and not disputed, that a landowner is entitled to the use of the water originating upon his land, subject only to the rights which others may acquire by prescription.

5 Haw. at 221.

*ahupuaa* did not carry with it the right to *all* the surplus water. *Id.* at 683. Instead, the court held:

> Surplus water. This, in our opinion, is the property of the konohiki [of the entire *ahupuaa*], to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa. By ancient Hawaiian custom this was so . . . [N]o limitation, so far as we can learn, ever existed or was supposed to exist to his power to use the surplus water as he saw fit.

*Id.* at 680. The indication in *McBryde I* that the foregoing passage was dictum, 54 Haw. at 182, 504 P.2d at 1336, was erroneous, since the determination of who owned the surplus water was, as it is in this case, necessary to the proper resolution of the controversy between the parties to the suit. *Cf. State v. Tominaga,* 45 Haw. 604, 612-13, 372 P.2d 356, 361 (1962).

The next case to consider title to the surplus water of a stream was *Carter v. Territory,* 24 Haw. 47 (1917). In *Carter,* a stream originated on one *ahupuaa* (owned by the Territory) and flowed through that land to a second *ahupuaa* (owned by the plaintiff). The sole issue in the action was whether the Territory, *as* konohiki *of the upstream* ahupuaa, was entitled to all of the storm and freshet surplus water in the stream. The court acknowledged that "[w]here a stream flows through a single *ahupuaa* . . . the [normal] surplus waters of the stream belong to the *ahupuaa.*" *Id.* at 70. However, it went on to hold that the ownership of *storm and freshet water* which passes through two *ahupuaas* must be divided between them on the basis of the common law doctrine of riparianism.[18] *See Territory v. Gay,* 31 Haw. 376, 404 (1930) (Parsons, J., concurring in part and dissenting in part). Whatever the wisdom of the *Carter* court in adopting the riparian doctrine with respect to this class of surplus water, a necessary element of its holding in this regard was that such water was subject to private ownership and was *not* the property of the government. *See Foster v. Waiahole Water Co.,* 25 Haw. 726, 734 (1921) (surplus water is the "class of

---

[18] *See* pt. III.D.2. *infra.*

water which originally the chief or *konohiki* could dispose of at will irrespective of the rights of the other owners and tenants''). The overruling of this aspect of *Carter* in *McBryde I* was ill-advised, especially in light of the reliance on that case earlier in the court's opinion for the proposition that the water law of this State is governed by riparian doctrine. *See* 54 Haw. at 182, 504 P.2d at 1336.

Finally, *Territory v. Gay, supra,* held unequivocally that the normal surplus water of a stream was the private property of the *konohiki* of the *ahupuaa* or *ili kupono* on which it originates. This was a suit by the Territory to enjoin diversions by Gay and Robinson (both parties here) of sur- plus water from the Koula stream. The Territory argued that as owner of the *ahupuaa* of Hanapepe it was entitled to all the surplus water originating in the valley, even though the source of that water was in the *ilis kupono* of Koula and Manuahi, owned by Gay and Robinson. The court, however, reasoned that an *ili kupono* was co-equal in dignity with an *ahupuaa,* and that at least as to normal surplus water which originated on an *ili kupono* the *konohiki* thereof had title paramount to that of the *konohiki* of a downstream *ahupuaa*.[19] *McBryde I* gave a grudging acceptance to *Gay* by holding that as between the State and Gay and Robinson the case was res judicata. 54 Haw. at 177-79, 504 P.2d at 1334-35. However, the court proceeded to sap that precedent of its force by holding that under established Hawaiian water law there is no such thing as ''normal daily surplus water.'' *Id.* at 199, 504 P.2d at 1345. In doing so, the court ignored the well-defined and often reiterated meaning acquired by the term ''surplus water'' over the course of more than a century

---

[19] The *Gay* court was split three ways. Perry, C.J., felt that *all* the surplus water of a stream, normal and storm and freshet, belongs to the *konohiki*, and thus would have overruled Carter v. Territory, *supra*. Banks, J., would have held that all the surplus water of a stream belongs to owners of land along the *ripa* thereof according to the principles of common law riparianism, and therefore would have extended the *Carter* holding to include *both* storm and freshet surplus water and normal surplus water. Parsons, J., agreed with Mr. Chief Justice Perry that normal surplus water belongs to the *konohiki*, but concluded that on the record the question of title to storm and freshet surplus was not presented, and therefore expressed no opinion on the question of whether *Carter* should be overruled.

of Hawaiian law, *viz.*, all water in a stream not required to satisfy appurtenant or prescriptive rights. *See* HUTCHINS 69 & n.15 and cases cited therein; note 6 *supra*. It follows that the *Gay* case awarded to Gay and Robinson real and substantial water rights in accordance with this meaning. *See McBryde Sugar Co. v. Robinson, supra* at 206, 504 P.2d at 1348 (Marumoto, J., concurring and dissenting).

The foregoing judicial pronouncements, even standing alone, are highly persuasive authority for the proposition that title to the surplus waters of *maheled* land passed into the private hands of the *konohikis*. As stated in *Yoshizaki v. Hilo Hospital*, 50 Haw. 150, 153, 433 P.2d 220, 222-23 (1967), this court is not "as free in deciding cases in the area of real property as in the area of torts," even if it is assumed, for the sake of argument, that the above-mentioned line of precedent projects a consistently erroneous line of reasoning. *In re Austin*, 33 Haw. 832, 839 (1936) (the doctrine of stare decisis has a special force in the area of land law; even though prior decisions may be unsound, if they are "long established and conformed to . . . such decisions should not be overturned").[20] The very substantial agricultural industry of this state exists in its present configuration only by virtue of great expenditures made for the development of irrigation systems. *See McBryde Sugar Co. v. Robinson, supra* at 201, 208, 504 P.2d at 1346, 1349 (Marumoto, J., concurring and dissenting). These systems are designed to deliver vast amounts of water which, under prior decisions of this court, was thought to be the subject of private ownership and development. *See, e.g.,* WADSWORTH 150-58. *See generally* 3 KUYKENDALL 62-70; R. KUYKENDALL & A. DAY, HAWAII: A HISTORY 128, 153-54 (rev. ed. 1948).

I discuss the constitutional ramifications of the court's sudden about-face from these decisions in pt. IV of this opinion. But I need not rest the judgment that the court erred in *McBryde I* as a matter of state law solely on a re-evaluation

---

[20] *See* Langenegger v. State, 64 N.M. 218, 222, 326 P.2d 1098, 1101 (1958) ("The rule that these drainage waters are private has become a rule of property, and it is now too late to change it, even if we were inclined so to do").

of prior case law and ancient Hawaiian usage. There is other historical evidence which lends final force to that judgment.

### D. *The 1917 Report of the Water Commission of the Territory of Hawaii to the Governor*

In 1915, the Legislature of the Territory of Hawaii, concerned about providing for the optimum utilization of the water resources within the territory under then existing laws, passed An Act to Provide for the Appointment of a Commission to Examine into the Water Resources and Water Laws of the Territory. L. 1915, Act 36. The first section of the statute provided as follows:

> The governor is hereby authorized to appoint a commission of three persons, one or more of whom shall be a member or members of the legal profession, which shall serve without pay, *and which shall collect and examine available data and information relative to the water resources, both underground and surface, and both privately and publicly owned or controlled, in the Territory of Hawaii;*
>
> *Which shall also examine and make a study of existing laws pertaining to the diverting, developing, using, conserving, holding, and wasting of water;*
>
> Which shall, if deemed necessary, employ the services of legal and technical experts;
>
> Which shall have the power to visit, examine and measure all existing water sources, channels, ditches, wells, tunnels or other structures used for transporting or utilizing water; and
>
> *Which shall make such recommendations and draft such legislation as may by it be deemed necessary to serve the best interests of the people of the Territory of Hawaii,* and shall embody the same in a report to the governor on or before January 1, 1917.

(Emphasis added). As the italicized portions of the statute indicate, the mandate of the Commission was far-ranging, and included no less than an invitation to propose a complete revision of the water laws of the territory should such a

change be found necessary.

Soon after the passage of the Act, the governor appointed Messrs. G. Larrison, A. Smith (then the first Deputy Attorney General of the Territory) and T. Sedgwick as commissioners to undertake the study. They were assisted in this regard by A. Chandler, a member of the State Water Commission of California and a foremost authority on water law. After nearly two years of preparation, the Commission issued its recommendations in the form of a *Report of the Water Commission of the Territory of Hawaii to His Excellency the Governor of Hawaii* (January 13, 1917) [hereinafter cited as *Water Commission Report*].

The Commission recommended the adoption of a detailed code relating to the development and husbandry of underground artesian water, because in large measure the use of such sources of water had begun relatively late in Hawaii's history, *see* 3 KUYKENDALL 66-70, and hence a tested and well-reasoned system of artesian water regulation had not had time to evolve. *See* HUTCHINS 178-79 and cases cited therein. The Legislature adopted virtually *verbatim* the specific legislation drafted by the Commission. RLH 1955 ch. 101 (originally enacted as L. 1917 ch. 156).

However, with respect to surface waters, the Commission reported as follows:

> *We have come to the conclusion that we do not care to recommend any legislation concerning surface waters.* As is stated by Mr. Chandler in his report to the Commission dated November 4, 1916 . . . *we already have a very good workable method for the determination of rights to surface waters; and the law relative thereto has been fairly definitely settled by a series of decisions.* There are, it is true, several questions as yet unsettled, but we believe them to be of such a nature that they can be better determined by the courts than by positive legislation which could only attempt to define and not change vested rights in the absence of provision for compensation therefor.
>
> *Accordingly, we make no recommendation for any legislation at the present time pertaining to the diverting, developing, using, conserving, holding or wasting of sur-*

*face water.*

*Water Commission Report* 9 (emphasis added). These recommendations were evidently accepted, for no laws relative to surface waters were subsequently forthcoming. This acceptance by the Legislature of the Commission's recommendation that existing judicial precedent adequately and correctly reflected the status of Hawaiian water law is legislative recognition that surplus surface waters belong to the *konohiki* of the *ahupuaa* or *ili kupono* on which they originate. The Commission and the Legislature not only had before them dicta supporting this proposition in *Peck v. Bailey, supra* and *Davis v. Afong, supra*, but also an express holding to this effect in *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co., supra*.

E. *The Long-standing Position of the Territorial*
*and State Governments of Hawaii with Respect*
*to the Ownership of Surplus Water*

1. *Evidence of the State's Non-ownership*

For a period in excess of 60 years, the government of Hawaii has executed the laws of the Territory and the State in a manner which both expressly and impliedly has acknowledged that title to surplus water rests in the owner of *ahupuaa* or *ili kupono* on which it originates. Although in a position to know the law relating to this subject and to enforce it in the best interests of the people of Hawaii, successive attorneys general and their offices as well as territorial and state taxing authorities have consciously adopted legal positions premised on the basic proposition of private ownership of surplus water.

In a *Statement Regarding the Law of Waters and Water Rights in Hawaii, as Existing with Relation to Fresh Waters*, 4 HONOLULU WATER COMMISSION RECORDS 169 (1908), the then attorney general of the Territory of Hawaii, C. R. Hemenway, specifically acknowledged the right of the *konohiki* to surplus water arising on his land. In doing so, he noted that King Kamehameha III *maheled* not only land into private

ownership, but also all the water flowing on the land. *Id.* at 169-70. Similarly, in 1919 the attorney general gave an opinion to the Lahainaluna School on Maui with respect to its water rights which rested on the implied proposition that the Pioneer Mill Company, not the Territory, owned the surplus waters flowing in the watercourses of the valley of Kauaha. 1919 OP. ATT'Y GEN. 386.

Other evidence of the government's position in this regard abounds. In *Carter v. Territory, supra,* the Territory took the unequivocal stance that surplus water belongs to the *konohiki* of the *ahupuaa* on which it originates. Opening Brief for Territory at 272-73. The legal arguments of the Territory in *Territory v. Gay, supra,* echoed its position in *Carter.* Opening Brief for Territory at 16. Indeed, in this very case the State made no claims to the surplus water of the Hanapepe watershed, conceding the private ownership thereof to Gay and Robinson. *Cf.* Opening Brief for State at 7-9, *McBryde Sugar Co. v. Robinson, supra.*

Moreover, since at least 1913, the Territory and thereafter the State have taxed surplus water severed in ownership from the land upon which it originated as the property of its private owner. *See In re Taxes, Waiahole Water Co.,* 21 Haw. 679 (1913). In *Waiahole Water,* this court upheld the taxation to the taxpayer of surplus water which had been conveyed to him by the *konohiki* of an *ahupuaa.* In holding that a tax assessment on the water separate from its land of origin was proper, the court noted that "[t]he intent of grantors, grantee *and assessor* to separate the water rights from the remaining interests in the lands is beyond doubt." *Id.* at 682 (emphasis added). *See also* Brief for appellee at 8-9, *id.* Similarly, it was established without contest in *Territory v. Gay, supra,* that "the Territory has been assessing and collecting taxes upon the land of Makaweli at its value as the same has been enhanced by the use of Koula water upon it, [*i.e.,*] the value of the [surplus] water has regularly been assessed for taxation as the private property of the respondents." Opening Brief for Gay and Robinson at 43, *id.*

This practice of taxing surplus water as private property, in addition to the knowingly and consistently followed po-

sition of successive attorneys general and their staffs, constitute compelling historical evidence that the State and its predecessor governments have at all times prior to this court's opinion in *McBryde I* regarded surplus water as private and not sovereign property. *In re Title of Kioloku,* 25 Haw. 357 (1920), is highly persuasive in this regard. In *Kioloku* the Territory claimed title to an *ahupuaa* that was ostensibly privately-owned on the ground that the land was not included in the Great Mahele of 1848. Although there was no record of an award of the land in question, the court nonetheless refused to award it to the Territory, reasoning that the government had made no claim of ownership of the property for nearly sixty years and that:

> during the whole period the property was assessed as the property of Kalakaua and his successors in interest and taxes were collected by the government down to the date of the institution of this proceeding. As said in *Jover v. Insular Government,* 221 U.S. 623 [(1911)], we would not be justified in assuming that the State would collect taxes on its own property.

*Id.* at 364.[21]

The foregoing facts indicate persuasively that the reasoning of *McBryde I* turned on assumptions which are wholly unjustified by and contrary to the consistent and longstanding posture of the Hawaiian government with respect to surplus water. Such a posture knowingly adopted for more than half a century, is strong evidence of the government's non-ownership, and at the very least should have been dealt with by the majority.

---

[21] In Jover v. Insular Government, 221 U.S. 623 (1911), the issue was whether an ancient land grant by the Spanish governor of the Philippine Islands to plaintiff's predecessor in interest was valid or in excess of the governor's authority. The Court held that in light of historical evidence the governor did have authority to execute the grant in question, but proceeded to consider the following other circumstances as supportive of this conclusion:

> The Spanish authorities at Manila, although familiar with what was done and claimed under the grant, and although in a position to know and enforce the law applicable to it, *did not call it in question at any time during the thirty-nine years of Spanish dominion after it was made, but, on the contrary, treated it as valid by imposing taxes upon the land as private property.* This is persuasive proof that in making the grant the Governor General did not exceed his authority.

*Id.* at 633 (emphasis added).

## 2. *Equitable Estoppel*

In response to the argument of the Territory in *Territory v. Gay, supra,* that surplus water in the Hanapepe Valley was government owned, Gay and Robinson adduced considerable evidence that the government should be estopped from asserting whatever title it had to such water. *See* Gay and Robinson, *id.,* at 33-43. This evidence included the government's silence in the face of Gay and Robinson's overt and well-known expenditures of large sums of money for the development of surplus water, statements by then Governor Frear acquiescing in Gay and Robinson's claim of private title, and taxation by the Territory of surplus water as privately owned by Gay and Robinson.

It was the position of Gay and Robinson that in the event it should lose on the issue of whether the *konohikis* of *ilis kupono* and *ahupuaas* were equal in status and rights, the evidence of the government's affirmations of and knowing acquiescence in Gay and Robinson's title to surplus water in the Hanapepe Valley, coupled with the latter's extensive reliance thereupon, sufficed equitably to estop the Territory from claiming ownership of the water. *Cf. Kauhi v. Liaikulani,* 3 Haw. 356 (1872). Of course, this position was never tested since *Territory v. Gay* held that Gay and Robinson owned the surplus water in any event. Nor did Gay and Robinson urge the point at trial in this case, since the basic ownership of surplus water in the valley was not contested by the State and since *Territory v. Gay* had *seemingly* settled the issue.

Whatever doubts that previously existed in this State as to whether the government can be equitably estopped, *see Godbold v. Manibog,* 36 Haw. 206, *reh. denied,* 36 Haw. 230 (1942), in my opinion were dispelled by *Yamada v. Natural Disaster Claims Commission,* 54 Haw. 621, 513 P.2d 1001 (1973). In an analysis that alternatively supported the result in the case, *Yamada* announced "that the doctrine of equitable estoppel is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice." *Id.* at 629, 513 P.2d at 1006. While this aspect of *Yamada* was

subsequently disavowed by the court as not essential to the result in the case, *Yamada v. Natural Disaster Claims Commission*, 55 Haw. 126, 516 P.2d 336 (1973), the soundness of its reasoning has not been questioned. That it correctly projects the law of this jurisdiction is apparent from the recent decision of this court, *Waianae Model Neighborhood Association, Inc. v. City & County*, 55 Haw. 40, 44, 514 P.2d 861, 864 (1973), wherein we agreed with the following proposition as "eminently fair and equitable":

> [A]n act of an administrative official which is without any semblance of compliance with or authorization in an ordinance, is beyond his competence and is utterly void; but an act of such official, done in good faith and within the ambit of his duty, upon an erroneous and debatable interpretation of an ordinance, is no more than an irregularity, and *the validity of such act may not be questioned after expenditures have been made and contractual obligations have been incurred in reliance thereon in good faith.*

(Emphasis added).

*Yamada* involved an attempt by the Natural Disaster Claims Commission to revalue downwards certain tax credits it had awarded the plaintiff as a result of property losses he had suffered in a tsunami. Relying on the originally adjudicated amount of these credits, the plaintiff had made substantial expenditures in developing his property on the island of Hawaii. These expenditures in reasonable reliance on the Commission's award, the court held, meant that the government was estopped from now reducing that award. The court stated:

> A denial of such credits after more than two years means, in effect, that his investment in compliance with the statute is wholly dependent upon the State's continuing decision not to take away that which it gives. We think this is a patently unfair burden to impose upon the claimant.

54 Haw. at 630, 513 P.2d at 1007.

The relevance of *Yamada* to this controversy is obvious. That the government had led Gay and Robinson into the expenditure of large sums of money in the development of

surplus water, Gay and Robinson offered to prove in *Territory v. Gay, supra*. Moreover, the position of the Territory in this regard originated at the highest levels of government, and was not merely the unauthorized stance of low-echelon employees. Compare *Godbold v. Manibog, supra* at 214-15. In the circumstances, even assuming the correctness of *McBryde I* as a general matter, Gay and Robinson should have been afforded an opportunity to prove that the State should be estopped from asserting ownership of the surplus water in the Hanapepe Valley. If anything, evidence showing the government's long-standing position and Gay and Robinson's reliance presents a factual situation in which the equities may be greater in favor of estoppel than in *Yamada*. Surely the logic of *Yamada* is that the government may not lawfully reverse previously firm policies with respect to property when, in reasonable reliance thereupon, private parties have expended significant sums of money. *See City of Long Beach v. Mansell*, 3 Cal. 3d 462, 476 P.2d 423, 91 Cal. Rptr. 23 (1970). I find the majority's failure to consider this argument in the present case legally inexcusable.

### F. *Normal Surplus Water is the Exclusive Property of the* Konohiki *of the* Ahupuaa *or* Ili Kupono *on which it Originates*

In view of ancient Hawaiian usage, Hawaiian judicial precedent, and the other historical evidence explored in this opinion, I would reverse *McBryde I* with respect to the ownership of normal surplus water and adhere to the prior position of this court consistently expressed in *Hawaiian Commercial Sugar Co. v. Wailuku Sugar Co., supra, Carter v. Territory, supra,* and *Territory v. Gay, supra*. To reiterate, these cases held that when Kamehameha III *maheled* his lands in 1848, it was his clear intent to pass both the title to land and the title to water thereupon. Consistent with ancient Hawaiian usage, this meant that upon the *konohikis* devolved title to all surface water originating on their lands excepting that required to satisfy the appurtenant rights and prescriptive rights of others. Stated flatly, normal surplus water should be the

private property of the *konohiki* from whose land it springs and not the property of the State.

### III. THE TRANSFERABILITY OF PRIVATELY OWNED WATER IN HAWAII

### A. *The Reasoning of* McBryde I

The second major branch of *McBryde I* was that private water rights, however acquired,[22] are subject to the strictures of the common law doctrine of riparianism. Under that doctrine, the ownership of a parcel of land abutting the *ripa* of a stream carries with it "the right to flow of [the] stream in the form and size given it by nature." *McBryde Sugar Co. v. Robinson, supra* at 192-93, 504 P.2d at 1342. The court held that a corollary of this right at common law is the privilege of riparian landowners to prohibit the diversion of water by one such landowner unless he returns it to its original watercourse substantially undiminished in quantity. *See* HUTCHINS 95; L. TECLAFF, *What You Have Always Wanted to Know about Riparian Rights, But were Afraid to Ask,* 12 NATURAL RESOURCES J. 30, 39-53 (1972) [hereinafter cited as TECLAFF].

The court's reasoning was bottomed wholly on section 7 of the Enactment of Further Principles, originally published as L. 1850, § 7, at 202, and presently compiled in HRS § 7-1[23] which, in its English version, guarantees to the "people . . . a right to drinking water [and] running water," and also declares that "[t]he springs of water [and] running water shall be free to all, on all lands granted in fee simple." Based on this language, and the historical generalization that "the missionaries, many of whom came from Massachusetts, not only brought the Christian religion to the Hawaiian people, but also brought with them the English common law as recognized in Massachusetts," 54 Haw. at 193, 504 P.2d at 1342,

---

[22] In view of the holding of *McBryde I* such private rights would include water appurtenant to a specific parcel of land and water acquired by prescription, but not normal and storm and freshet surplus waters.

[23] This section is set out in full at note 10 *supra*.

the court concluded that privately owned water may only be used in connection with the land to which it is appurtenant and may not be transported to *kula* land elsewhere. This conclusion followed, it was thought, from the cases and authorities on common law riparianism which were examined with considerable care in *McBryde I*. *Id.* at 193-97, 504 P.2d at 1342-44.

While *McBryde I* may have been adequate in its exegesis of the law of riparianism as a general matter, it is my opinion that the court erred in holding that the Enactment of Further Principles codified that law as the system by which to measure water rights in Hawaii. While the array of authorities affirming my position in this respect are persuasive as a matter of water *policy*,[24] I base my conclusions primarily on statutory construction and an analysis of Hawaiian usage and judicial precedent during the Hawaiian monarchy and thereafter.

Under HRS § 1-1,[25] it would be the responsibility of the court to declare riparianism to be the law of this State *unless* it was able to discern "Hawaiian judicial precedent . . . or . . . Hawaiian usage" indicating that a different legal doctrine

---

[24] As stated by Mr. Hutchins:

[T]he riparian doctrine . . . is not well suited to areas in Hawaii . . . in which the demand for irrigation water substantially exceeds the supply. . . .

The . . . doctrine was developed under essentially humid conditions, where the supplies of water generally were much greater than the requirements for water, and where irrigation seldom was practiced, if at all.

HUTCHINS at 95; *see* C. HEMENWAY, *Statement Regarding the Law of Waters and Water Rights in Hawaii, as Existing with Relation to Fresh Waters*, 4 HONOLULU WATER COMMISSION RECORDS 169, 171 (1908); WADSWORTH *passim; cf.* City Mill Co. v. Honolulu Sewer & Water Comm'n, 30 Haw. 912, 938-43 (1929) (declining to adopt as the law of Hawaii the English common law rule of absolute ownership of percolating waters). *See generally* TECLAFF 39-53.

[25] That section provides:

The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided, that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

had been followed in Hawaii prior to January 1, 1893.[26] As will be demonstrated, however, Hawaiian history and case law establish that privately owned water is severable from the land to which it was originally appurtenant and is freely transportable to other lands both within and without the same watershed — a doctrine fundamentally at odds with the riparian theory espoused by *McBryde I*.

## B. *Section 7 of the Enactment of Further Principles*

Subsequent to the Great Mahele, all lands in Hawaii were divided into three main categories: Crown Lands (retained by the King for his own private estate), *Konohiki* Lands *(maheled* into the private ownership of the chiefs and *konohikis),* and Government Lands (established as the property of the King *as sovereign* of Hawaii). *See* 1 KUYKENDALL 288-89. All of these lands, however, were made "subject to the rights of tenants" *(hoaainas)* by virtue of An Act Relating to the Lands of His Majesty the King and of the Government, RLH 1925, Vol. II, 2152 (originally enacted as L. 1848, at 22).

Events made it clear, however, that the phrase "rights of tenants" was not self-explanatory, and that legislation was needed to define *hoaaina* rights with greater particularity. Accordingly, the Privy Council undertook to delineate the specific meaning that the Great Mahele had for the *hoaainas* living on the three principal categories of *maheled* land. *See generally* J. CHINEN, THE GREAT MAHELE: HAWAII'S LAND DIVISION OF 1848, at 29-31 (1958). As a result of their deliberations, on December 21, 1849 the Privy Council adopted four resolutions which were enacted by the Legislature as the first

---

[26] The Hawaiian judicial precedent and usage referred to in HRS § 1-1 are those that arose prior to January 1, 1893, the effective date of that section. State v. Zimring, 52 Haw. 472, 474-75, 479 P.2d 202, 204 (1970); De Freitas v. Coke, 46 Haw. 425, 429-30, 380 P.2d 762, 765-66 (1963). The basic purpose of the provision was summarized in *De Freitas* as follows:

It is apparent that when the legislature adopted [HRS § 1-1] it was cognizant of the fact that before such enactment, the courts of Hawaii had not adopted the common law of England *in toto* and consequently made certain qualifications. Accordingly, it was deemed necessary to provide for exceptions.

*Id.* at 430, 380 P.2d at 766.

four sections of the Enactment of Further Principles on August 6, 1850. These four sections, together with sections 5 and 6 passed by the Legislature on August 15, 1850, afforded *hoaainas* the private ownership of those parcels of land which they had traditionally dwelled upon and cultivated, and also established procedures by which *hoaainas* could receive allodial title to their *kuleanas* by way of grants from the Land Commission.

It was not until nearly one year later, however, that the Legislature added section 7 to these provisions. The legislative history of this section shows that it was intended to be the sole and exclusive measure of the rights of the *hoaainas* as against the *konohikis* of the land within which the *kuleanas* were situated. *See Oni v. Meek,* 2 Haw. 87, 94-96 (1858) (Robertson, J.).[27] *See also Carter v. Territory,* 24 Haw. 47, 67 (1917). Subsequent to the adoption by the Privy Council of the first six sections of the Enactment of Further Principles, but prior to their passage by the Legislature, the King had expressed concern that "a little bit of land, even with allodial title, if they [the *hoaainas*] were cut off from all other privileges, would be of very little value." *Privy Council Minutes* (July 13, 1850).

This concern matured into the enumeration of specific *hoaaina* rights contained in section 7, adopted by the Privy Council on August 27, 1850. The measure was the product of deliberations among "the *native* members of the Privy Council presided over by the King," *Privy Council Minutes* (August 17, 1850) (emphasis added), an historical circumstance which severely undercuts the assumption in *McBryde I* that section 7 was the product of *haole* missionaries with backgrounds in English common law. Section 7 was finally enacted by the Legislature in June of 1851, and signed into

---

[27] In *Oni,* a *hoaaina* claimed the right of pasturage against his *konohiki* based upon, *inter alia,* ancient tenant usage in the area. The court held, however, that section 7 of the Enactment of Further Principles was a declaration of *"all* the specific rights of the hoaaina, (excepting fishing rights) which shoud be held to prevail against the fee simple title of the konohiki," 2 Haw. at 95, and that the failure of that section to provide specifically for the right of pasturage meant that no such right existed.

law by the King on July 11, 1851. L. 1851, at 98-99. It was passed and printed in both the Hawaiian and English languages.

As indicated previously, the English version of the statute provided that "[t]he people shall also have a right to *drinking water,* and *running water,* and the right of way, [and t]he . . . *running water,* and roads shall be free to all, on all lands granted in fee simple." (Emphasis added). The word "people" in this section was properly interpreted by Mr. Justice Robertson in *Oni v. Meek, supra* at 96, to mean the *hoaainas* within the boundaries of the *konohiki's* land. *McBryde I* held that the right of these *hoaainas* to "drinking water" and "running water" in the English version of the statute meant the right to the natural flow of a stream in accordance with riparian doctrine — a right which passed to successors in interest to their *kuleana* lands.

However, the Hawaiian version of the statute does not bear out the court's interpretation. The original Hawaiian text is as follows:

> I ka alodio ana o kekahi Konohiki i kona aina, a mau aina paha, aole no e nele na kanaka o kona aina ponoi a mau aina paha i ke kii ana i wahie, a i laau hale, a i aho, a i kaula a i pili, a i lai nona iho, aole nae i mea kuaiʻi mea e waiwai ai oia, e loaa no hoi ia lakou ka pono o ka wai inu, a me ka *wai hookahe,* a me ke ala hele. A o na punawai a me na *wai e kahe ana,* a me na ala hele e noa no ia i na kanaka a pau mai o a o, ma na aina Alodio. Aole nae pili keia i na punawai, a me na hawai i hanaia e pono ai lakou iho.

(Emphasis added).
I have independently investigated the meaning of the Hawaiian, with particular focus on the phrases *"wai hookahe"* and *"wai e kahe ana,"* which were translated in the English to mean "running water."[28] While it is true that

---

[28] This court has stated on numerous occasions that judges in Hawaii are "at liberty to resort, if necessary or convenient, to such trustworthy sources of information as may be deemed expedient" in resolving questions of the interpretation of an instrument or statute written in Hawaiian. Hapai v. Brown, 21 Haw. 499, 503 (1913). Such sources may include both dictionaries *and* experts (both of which were used here). *Id.* at 502-03; *see* Territory v. Bishop Trust Co., 41 Haw. 358, 367 (1956); Ii v. Judd, 13 Haw. 319, 325 (1901).

"[w]henever there is found to exist any *radical or irreconcilable* difference between the English and Hawaiian version of any of the laws of the State, the English version shall be held binding," HRS § 1-13 (emphasis added),[29] the difference between the two versions in this case is not "radical or irreconcilable," and hence the Hawaiian can be used as an aid in the interpretation of the English.[30] This analysis is particularly appropriate with respect to section 7, in view of the fact noted above that the *native* members of the Privy Council,

---

[29] HRS § 1-13 is an expanded version of section 1493 of The Civil Code of the Hawaiian Islands ch. 41, at 367 (1859), which provided:

SECTION 1493. If at any time a radical and irreconcilable difference, shall be found to exist between the English and Hawaiian versions of any part of this Code, the English version shall be held binding.

The reason for the limitation of this section to "radical and irreconcilable" differences can be discerned from the Preface to the Civil Code of 1859:

In accordance with a Joint Resolution of the Legislature, the undersigned were appointed by the Minister of the Interior to compare the Hawaiian and English versions of the New Code, assimilating the same as far as practicable, and to superintend the publication of the same. *The work of comparing and assimilating the two versions, has been one of great labor and care; and while we cannot hope to have effected a perfect agreement between the Hawaiian and English texts, we feel confident that, in this respect, the Civil Code will be found more satisfactory than any of the laws published heretofore.*

R. ARMSTRONG,
G. M. ROBERTSON,
Committee of Publication.

(Emphasis added). The confessed inability of the translators to achieve a perfect coincidence between the two languages underscores the need for comparative analysis of a bilingual statute where a conflict therein appears to be less than "radical and irreconcilable." This was just as true after the Civil Code as before it, when the Hawaiian version of a statute was held judicially to control in cases of radical or irreconcilable conflict. *Compare* Metcalf v. Kahai, 1 Haw. *225 (1856) (conflict is irreconcilable and hence the Hawaiian version controls when the English text holds owners of estray animals liable for four times the actual damage done and the Hawaiian text holds such owners liable only for actual damages) *with* Hardy v. Ruggles, 1 Haw. *225, 259 (1856) ("where there is a radical and irreconcilable difference between the English and Hawaiian, the latter must govern, because it is the language of the legislators of the country . . . [but t]he *English and Hawaiian may often be used to help and explain each other where the meaning is obscure, or the contradiction slight"*) (emphasis added).

[30] *See* cases cited in note 29 *supra*. As stated in In re Ross, 8 Haw. 478, 480 (1892) (emphasis added):

[T]he two versions [English and Hawaiian] constitute but one act. There is no dual legislation. As a rule one version is the translation of the other. *The effort is always made to have them exactly coincide,* and the legal presumption is that they do.

presided over by the King, initially drafted that provision and hence would logically be expected to have expressed themselves first in their native tongue.

I have consulted three dictionaries of the Hawaiian language[31] and Mrs. Zelie D. Sherwood, an expert translator of Hawaiian,[32] and all four sources independently confirm that, properly translated, the phrase *"wai hookahe"* means "water made to flow or to irrigate," and the phrase *"wai e kahe ana"* means "water already flowing."[33] Mrs. Sherwood has provided her translation of the whole text of section 7, and it would be instructive to quote the translation in full. It reads:

When a konohiki acquires Allodial Title to his land or lands, the native tenants on his own land or lands shall not be deprived of gathering fire wood, and wood for homes, twine, rope, pili and ti leaf for his own use, not, however for personal gain, they shall also have the right to drinking water, *to bring about the flowage of water* and a pathway. The wells and water *already flowing* and the pathways shall be free to all native tenants from one end of the Allodial lands to the other. This, however, does not include wells and aqueducts made for their own personal gain.

(Emphasis added).

In my opinion, the foregoing translation accurately reflects

---

[31] L. ANDREWS & H. PARKER, A DICTIONARY OF THE HAWAIIAN LANGUAGE (1922) (prepared under the direction of the Board of Commissioners of Public Archives of the Territory of Hawaii); M. JUDD, M. PUKUI & J. STOKES, INTRODUCTION TO THE HAWAIIAN LANGUAGE (1945); M. PUKUI & S. ELBERT, HAWAIIAN-ENGLISH DICTIONARY (3d ed. 1965).

[32] Mrs. Sherwood has testified as an expert frequently in civil litigation involving the translation of instruments written in Hawaiian, has translated Hawaiian documents for abstracting companies for more than 40 years, and is the author of ZELIE D. (FERNANDEZ) SHERWOOD, BEGINNING HAWAIIAN vols. I & II (1955).

[33] A reading of the English version of the proviso to section 7 supports this interpretation. The proviso announces that "water courses, which individuals have made for their own use" shall *not* be considered "running water" which is "free to all" within the meaning of the first part of the sentence of which the proviso is a part. The clear implication is that *ancient* water courses *(auwais)* are to be considered "running water" and that the intent declaring these *auwais* as "free to all" was merely to allow *hoaainas* to satisfy their domestic and agricultural water needs. *Cf.* Carter v. Territory, 24 Haw. 47, 58-59, 67 (1917).

the original meaning of section 7, which was merely that *kuleana* plots were guaranteed the right to appurtenant water for domestic and irrigation purposes, and in that context, the English translation reserving to *hoaainas* the right to "running water" is inherently ambiguous. "Running water" can mean many things, including water used for irrigation and domestic purposes, and therefore the more precise Hawaiian terms *"wai hookahe"* and *"wai e kahe ana"* (both denoting such limited uses of water) should be read by this court to qualify and limit the English. Compare *Metcalf v. Kahai*, 1 Haw. *225 (1856). This is an instance in which the English and Hawaiian texts are not in "radical or irreconcilable" conflict within the meaning of HRS § 1-13, but rather is an instance in which "the meaning is obscure, or the contradiction slight," and hence in which the two languages "may . . . be used to help and explain each other."*Hardy v. Ruggles*, 1 Haw. *255, 259 (1856) *see* notes 29 & 30 *supra*.

The foregoing analysis manifests the error of *McBryde I*. Section 7 of the Enactment of Further Principles guaranteed the right of *hoaainas* to water *for irrigation* and other domestic purposes. The obviously limited scope of this provision belies the court's interpretation of it as a wholesale codification of the common law doctrine of riparianism. Indeed, the right to use water for irrigation is wholly antithetical to riparianism as it existed in mid-nineteenth century England and Massachusetts. *See* HUTCHINS at 95; TECLAFF 44-45.

It follows that the reliance on this statute in *McBryde I* was misplaced. Analysis must therefore turn to whether Hawaiian judicial precedent or usage prior to January 1, 1893 established a system of water regulation different from the riparian doctrine that would otherwise be the law of this State by virtue of HRS § 1-1.[34]

---

[34] *See* notes 25 & 26 *supra*.

## C. *Hawaiian Usage Prior to January 1, 1893*

### 1. *Ancient Hawaiian Usage*

As indicated previously in this opinion, *see* pt. II.B. *supra,* central to Hawaiian culture prior to the advent of western influence was a sophisticated system of water regulation. Early Caucasian explorers, including Cook in 1778, Vancouver in 1798, and Campbell in 1809 commented with amazement and admiration on the complicated and technically advanced network of canals utilized by the Hawaiians in irrigating their crops. *See* WADSWORTH 125. Modern historians of Hawaiian civilization confirm the existence of these irrigation systems. *See, e.g.,* E. S. HANDY & E. G. HANDY, NATIVE PLANTERS IN OLD HAWAII 62-63 (1972); R. KUYKENDALL & A. DAY, HAWAII: A HISTORY 9, 91 (1948); A. PERRY, A BRIEF HISTORY OF HAWAIIAN WATER RIGHTS 3-7 (1912); WADSWORTH 125-36.

It has been noted already that under the ancient system of land tenure, the *konohiki* of an *ahupuaa* or *ili kupono* was given control over the surplus water originating on the land, albeit subject to the king's ultimate power of disseizin. The *konohiki* had plenary authority to demand the production of labor for the construction and maintenance of *auwais,* and also to marshal the water resources of the *ahupuaa* or *ili kupono* according to his perception of the relative agricultural and domestic needs of the *hoaainas* living thereupon. WADSWORTH 129-31. Traditionally, it was always within the power of the *konohiki* to divert water from lands on the *ripa* of a stream to other lands which were not appurtenant to the stream and which, indeed, had always theretofore been *kula.* *See Territory v. Gay,* 31 Haw. 376, 399-400 (1930); HUTCHINS 84-85.

While it is true that these diversions from wet taro lands to *kula* lands for the most part occurred within the confines of a single watershed, this was probably only due to the absence of the technology required for the transportation of water across mountain ridges.[35] *See Wong Leong v. Irwin,* 10 Haw.

---

[35] The Hawaiians in fact made inter-watershed transfers of water where tech-

265, 271-72 (1896). As stated in *Irwin*, however, "[t]here is no difference in principle between a transfer [of water] from one place to another in the same ahupuaa and a transfer from one ahupuaa to another [outside the watershed of the first ahupuaa]." *Id*. at 272. By hypothesis, both kinds of transfers assume water to be both the private property of the transferor and capable of permanent diversion from its original water-course — characteristics which are inherently inimicable to the theory of riparianism which was expounded in *McBryde I*. *See McBryde Sugar Co. v. Robinson, supra* at 193-97, 504 P.2d at 1342-44.[36]

## 2. *Hawaiian Usage in the Latter Half of the Nineteenth Century*

With the advent of large-scale sugar cane cultivation in the last half of the nineteenth century, irrigation and water rights acquired a new dimension of importance in Hawaii.[37]

---

nologically possible and economically necessary. There is, for example, an ancient aqueduct on Kauai, called the Menehune Ditch, which "is built around the base of a high cliff which hems in the Waimea River just before it reaches its delta area on the southwest coast of the island, and diverts irrigation water from the river to the series of *lo'i* [irrigated taro terraces] to seaward of the cliff." E. S. HANDY & E. G. HANDY, NATIVE PLANTERS IN OLD HAWAII 62 (1972). Furthermore, there is some evidence that with the use of gunpowder supplied by Caucasians in the early nineteenth century the Hawaiians constructed aqueducts for the transportation of water from one watershed to another. There exists, for example, an irrigation tunnel between watersheds near Niulii on the Island of Hawaii which had to be driven through 200 feet of lava rock. Its date of construction is put at between 1823-49 by one commentator, J. WILLIAMS, *A Little Known Engineering Work in Hawaii*, 1919 THRUM'S ANNUAL 121-26, and at an even earlier date by another commentator. WADSWORTH 127.

[36] *McBryde I* also indicates that the riparian rights of the *hoaaina* "may be in connection with his right of laundering, canoeing, swimming, bathing, etc." 54 Haw. at 193, 504 P.2d at 1342. In this connection it should be noted that under ancient Hawaiian unwritten law it was *kapu* for an individual to swim or bathe in a stream at any point above its mouth, *see* J. Wise, *The History of Land Ownership in Hawaii* 86, in ANCIENT HAWAIIAN CIVILIZATION: A SERIES OF LECTURES DELIVERED AT THE KAMEHAMEHA SCHOOLS 81 (rev. ed. 1973) — an "Hawaiian usage" within the meaning of HRS § 1-1 which, if true, would lessen the enjoyment, if nothing else, of the riparian rights purportedly announced in *McBryde I*.

[37] It is interesting to note that the development of irrigation on a large scale in the continental United States is generally said to have begun with the Mormon migration to Utah in 1847. The growth of sugar cane irrigation in Hawaii was "essentially concurrent" with this development. WADSWORTH 142.

The estimated requirement of a ton of water to produce one pound of refined sugar, 3 KUYKENDALL 62, made the securing of ample supplies of water essential for sugar producers. The first irrigation *auwai* built expressly for sugar cane was in 1856 on Kauai, and another was dug ten years later on Maui. *See* R. KUYKENDALL & A. DAY, HAWAII: A HISTORY 119-20 (1948). While early producers made use of ancient *auwais*, the phenomenal growth in the number of acres of land under sugar cane cultivation during the period of 1874-98,[38] especially when much of that land was in relatively arid locales theretofore uncultivated, resulted in the construction of costly and elaborate new irrigation systems. The first such system of any size was the Hamakua ditch on the Island of Maui, built in 1878 for the purpose of irrigating sugar cane on the arid lands of central Maui with water from the northern side of the island. 3 KUYKENDALL 62-66; WADSWORTH 144. A great many other aqueducts were built thereafter, at considerable cost and for the purpose of irrigating *kula* land both inside and outside the watersheds from which the water was drawn. *See generally id.* at 150-58. Indeed, by 1890-91, an irrigation system for the transportation of water from the Hanapepe Valley to Makaweli on the Island of Kauai was completed and in operation. *See Territory v. Gay,* 52 F.2d 356 (9th Cir. 1931); 3 KUYKENDALL 66.

It seems clear that the foregoing history of ancient and nineteenth century Hawaiian water practices, sanctioned by contemporaneous judicial precedent, *see* pt. III.D. 1. *infra,* establishes an "Hawaiian usage" fundamentally at odds with the common law doctrine of riparianism. This being the case, HRS § 1-1 does not compel the court to read that doctrine *in toto* into our legal system dealing with regulation of water rights.

---

[38] Dr. Kuykendall notes that during the period of 1874-98, the number of acres under sugar cane cultivation increased from 12,225 to 125,000 — a ten-fold expansion. 3 KUYKENDALL 62.

### D. *Hawaiian Judicial Precedent on the Subject of Water Transferability*

#### 1. *Peck v. Bailey, 8 Haw. 658 (1867)*

The *Peck* decision was the product of Hawaii Supreme Court Chief Justice Allen sitting as a single justice in an equity proceeding in Superior Court. As indicated previously in this opinion, the case involved a controversy between landowners within a single *ahupuaa* with respect to one landowner's right to divert water which was appurtenant to a particular parcel of land from that land to another, *kula* parcel. Although the opinion discussed common law riparianism, the Chief Justice impliedly rejected that doctrine when he held as follows:

> The Court is of opinion, however, that the defendant had the right to use the water of his kalo [taro] land on other lands, if in the transfer or passage of water over his own land no injury was done to others. He is limited to the same quantity of water to which he was entitled on his kalo land by immemorial usage.

*Id.* at 666. The indication in *McBryde I* that this passage was dictum, 54 Haw. at 181, 504 P.2d at 1336, was unjustified, since essential to the resolution of the controversy in *Peck* was a decision on the question of water transferability. *Cf. State v. Tominaga,* 45 Haw. 604, 612-13, 372 P.2d 356, 361 (1962).

*Peck* was the only decision prior to January 1, 1893 which squarely dealt with the question of water transferability. *Cf. Kahookiekie v. Keanini,* 8 Haw. 310 (1891). Notwithstanding its status as a single justice opinion, *Peck* stands as "judicial precedent" within the meaning of HRS § 1-1, establishing the proposition that privately owned water is freely transferable to *kula* land and therefore that riparianism is not the law of this State. All subsequent opinions have so interpreted the case, and in view of the Hawaiian usage comtemporary with *Peck* and in ancient times, the court should give effect to its holding.

## 2. *Cases decided after January 1, 1893*

A brief review of the cases decided by this court on the subject of water transferability since *Peck* will highlight the incorrectness of *McBryde I*.

*Lonoaea v. Wailuku Sugar Co.*, 9 Haw. 651 (1895) involved the question of the transferability of water from a river to *kula* land within the same watershed. The court held:

> We find no objection either in law or reason to allowing the owner of land which is entitled to water from transferring the same amount of water to other land providing he thereby works no injury to others.

*Id.* at 665. This holding was reiterated on similar facts in *Horner v. Kumuliili*, 10 Haw. 174 (1895).

In *Wong Leong v. Irwin*, 10 Haw. 265 (1896), the defendant had diverted water from one watershed to *kula* land in another watershed. The court held specifically that the owner of land with the appurtenant or prescriptive right to water could transfer that water to *any* other land, whether in the same watershed or in another watershed, so long as the water rights of others were not thereby compromised. *Id.* at 270-72. The same reasoning was followed in *Palolo Land & Improvement Co. v. Wong Quai*, 15 Haw. 554 (1903), although that case involved the transfer of water to land in a single watershed.

The next case in sequence of time was *Carter v. Territory*, 24 Haw. 47 (1917). *Carter* dealt with a controversy between *konohikis* of two *ahupuaas* over storm and freshet surplus water which on occasion ran in a stream passing through both *ahupuaas*. The court held that the *konohikis* must share these storm and freshet waters according to the principles of common law riparianism. Although the reasoning of the *Carter* court is highly unsatisfactory in this regard, the result is nonetheless defensible on the ground that in ancient times the Hawaiians rarely availed themselves of storm precipitation and that therefore no "Hawaiian usage" under HRS § 1-1 existed to supplant common law riparianism as to this class of water. *McBryde Sugar Co. v. Robinson, supra* at 205-06, 504 P.2d at 1348 (Marumoto, J., concurring and dissenting); *see* HUTCHINS 94. Regardless of the wisdom of

*Carter* in terms of overall water policy, *see id.* at 94-98, its impact is "probably not of great practical importance in Hawaii, where the characteristic drainage areas are short and steep, where the flood waters of many streams come down in great quantities and flow for brief periods, and where practicable means of storing large quantities of flood water are not available." *Id.* at 95. Moreover, the holding of *Carter* has acquired over the course of more than half a century a special force as a rule of property law which is "long established and conformed to" and which therefore "should not be overturned" by this court. *In re Austin,* 33 Haw. 832, 839 (1936); *see* note 20 *supra.* The decision in *McBryde I* to overrule this aspect of *Carter* does violence to this basic principle of stare decisis.

The limited scope of the riparian doctrine announced in *Carter* was soon accentuated in *Foster v. Waiahole Water Co.,* 25 Haw. 726, 733-35 (1921), which held that *normal* surplus water was never appurtenant to any particular parcel of an *ahupuaa* or *ili kupono* and that it was freely conveyable by the *konohiki* apart from its land of origin. *Cf. In re Taxes Waiahole Water Co.,* 21 Haw. 679 (1913).

Finally, *Territory v. Gay,* 31 Haw. 376 (1930) applied *Wong Leong v. Irwin, supra,* to normal surplus water and held that the *konohiki* of the *ahupuaa* or *ili kupono* on which such water arose could transport it wherever he wished, including to *kula* land in an entirely different watershed. In doing so, a divided court expressly rejected riparianism as applied to any other class of water than the storm and freshet surplus dealt with in *Carter. See* note 19 *supra.* As Mr. Chief Justice Perry indicated:

> While it is, perhaps, technically true that, as stated in the *Carter* case, "private water rights in Hawaii are governed by the principles of the common law of England except so far as they have been modified by or are inconsistent with Hawaiian statutes, custom or judicial precedent," that statement is of very little, if any, consequence or significance in view of the widely prevailing Hawaiian customs and the judicial precedents long since established with reference to water rights in this Territory. Our system of

water rights is based upon and is the outgrowth of ancient Hawaiian customs and the methods of Hawaiians in dealing with the subject of water. No modifications of that system have been engrafted upon it by the application of any principles of the common law of England.

31 Haw. at 394-95. In my opinion, the foregoing statement correctly articulates the relationship between Hawaiian water law and common law riparianism except in the limited circumstances of the *Carter* case, and therefore the court should adhere to it in lieu of the analysis of the subject contained in *McBryde I*.

## IV. *THE UNCONSTITUTIONALITY OF McBRYDE I*

While the constitutionality of *McBryde I* was not one of the issues to which the court directed the parties to file briefs on rehearing, it is my opinion that the court should have dealt with this aspect of the case. In view of the wholly unexpected nature of the court's holdings in *McBryde I*, the parties of course could not have been expected to raise their constitutional claims as part of their appeals from the decision of the trial court. Since the parties asserted constitutional grounds for the reversal of *McBryde I* at the first possible instance — in their petitions for rehearing — their arguments in this respect are properly before the court, *cf. Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 678 (1930), and therefore I consider myself bound to discuss them here.

The due process clause of the fourteenth amendment to the Federal Constitution and article I, sections 4 and 18 of the State Constitution forbid the State from taking private property without just compensation. This prohibition speaks to all instrumentalities of state government equally, restraining the courts from engineering unconstitutional takings no less than the legislature. *See Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 241 (1897). *See generally Shelley v. Kraemer*, 334 U.S. 1, 14-15 (1948), and cases cited therein.

Although as a general rule judges are free to overrule prior cases which changed circumstances and perceptions reveal to have been unwisely decided, there are constitutional limits

on their power to do so. *Compare Brinkerhoff-Faris Trust & Savings Co. v. Hill, supra* at 681 n.8 (Brandeis, J.) *with Hughes v. State of Washington,* 389 U.S. 290, 294 (1967) (Stewart, J., concurring). *See generally Southern Pacific Co. v. Jensen,* 244 U.S. 205, 221 (1917) (Holmes, J., dissenting). In particular, when prior judicial precedent has established unequivocally a certain property right, a court may not subsequently declare that the right never existed when the consequence of such a holding is to frustrate the expectations of parties who justifiably relied on prior law in the management of their affairs. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 577 (1972); *Muhlker v. New York & Harlem R.R.,* 197 U.S. 544 (1905); *cf. N.A.A.C.P. v. Alabama,* 357 U.S. 449, 454-58 (1958).

Water rights associated with the ownership of land have always been regarded as property in Hawaiian jurisprudence. *See Peck v. Bailey,* 8 Haw. 658, 661-62 (1867); *Kaneohe Ranch Co. v. Ah On,* 11 Haw. 275 (1898). Specifically, the cases discussed previously in this opinion have held uniformly and without ambiguity that the successor in interest to the *konohiki* of an *ahupuaa* takes full title to all surplus water arising on his land, see pt. II.C. *supra* and that the same right devolves upon the successor in interest to the *konohiki* of an *ili kupono. Territory v. Gay, supra.* Likewise, prior case law in this jurisdiction has established with clarity that privately owned water is freely transferable to lands other than those to which it is appurtenant. *See* pt. III.D.2. *supra.* Gay and Robinson has expended large sums of money in the development and transportation of the surplus water which prior decisions of this court indicated that it owned, and the other private parties to this action have purchased their land, invested in irrigation systems, and entered into contractual relationships with buyers of water, all in reliance on the principle of free transferability of water rights espoused by a long line of Hawaii cases. In the circumstances, the decision of *McBryde I* that surplus water is owned by the State and that private water rights are appurtenant exclusively to the parcels of land on which they originate must be viewed as a retroactive "taking" of property theretofore recognized as

privately owned.

A case in point is *Muhlker v. New York & Harlem R.R.*, *supra*. In 1888, Muhlker bought a plot adjacent to a strip of land used for surface-level railroad tracks. In 1891, he erected a five story building on his parcel, at a time when the existing case law of New York held that a property owner's easements of light and air could not be acquired through prescription by a railroad company whose tracks were on the ground level of an adjacent piece of land. Muhlker sued to enjoin the railroad from erecting an elevated railroad which would have interfered with these easements, and an injunction was issued by the trial court and affirmed by the Appellate Division of the Supreme Court on the basis of the prior New York cases directly in point. The New York Court of Appeals, however, reversed in an opinion which in function overruled the prior cases and held that Muhlker's easements of light and air could be eliminated without compensation. This decision was in turn reversed by the United States Supreme Court on the ground that in overruling its prior cases, the New York Court of Appeals effectively took Muhlker's property rights (the easements of light and air) in violation of the fourteenth amendment. The Court noted that prior New York precedents establishing these rights were unambiguous, and that Muhlker had bought his land and made improvements thereon in reliance on the assurances of these precedents. This coalescence of well-established property rights and Muhlker's genuine reliance on the permanency thereof meant that the New York courts could not eliminate those rights without compensation, even though as a policy matter such a holding might be advantageous to the people of the state.

In a subsequent decision, *Chicago & Alton R.R. v. Tranbarger*, 238 U.S. 67, 75 (1915), the Court held that the doctrine of *Muhlker* extended to property rights "pertain[ing] closely to the use and enjoyment of land," but not to the right to maintain artificial structures inherently inimicable to the rights of other property owners. Other cases indicated that a judicial decision does not constitute an unconstitutional taking of property unless it cannot be reconciled with prior

unambiguous holdings on the subject. *Compare Demorest v. City Bank Farmers Trust Co.*, 321 U.S. 36 (1944) *with Brinkerhoff-Faris Trust & Savings Co.*, *supra*. Only if the judicial decision is a "perverse reading of [prior] law," will the limitation on property rights effected by it be deemed an unconstitutional taking. *O'Neil v. Northern Colorado Irrigation District*, 242 U.S. 20, 26 (1916) (Holmes, J.); *see St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners*, 168 U.S. 349, 371 (1897) (the test is whether the new case is "inconsistent with or opposed to any of [the court's] former decisions").

Notwithstanding their limits, the basic principles of *Muhlker* still stand, as the concurring opinion of Mr. Justice Stewart in *Hughes v. State of Washington*, 389 U.S. 290, 294 (1967), illustrates. *Hughes* was an action by Mrs. Hughes, owner of upland property that had been conveyed by the United States prior to Washington's statehood, against the State of Washington. At issue was title to accretions which had formed over the years on Mrs. Hughes' property by the ocean. Mrs. Hughes based her case on a Washington Supreme Court decision which held twenty years previously that title to gradual accretions vested in the owner of land adjoining the ocean; however, the Washington Supreme Court in her case overruled the prior decision and held that such accretions belonged to the state.

On certiorari to the United States Supreme Court, eight of the justices concluded that the decision in Mrs. Hughes' case should be reversed on the ground that title to accretions to land granted by the United States was governed by federal, not state law, and that under the federal decisions the owner of adjacent land also owned any accretions thereto. It was the opinion of Justice Stewart, however, that federal law controlled the disposition of only those accretions which formed on Mrs. Hughes' land prior to Washington's statehood in 1889. For accretions which formed thereafter, he concluded, state law governed.

Justice Stewart was therefore forced to consider whether the reversal by the Washington Supreme Court of its prior opinion on the subject of title to accretions constituted a

taking without just compensation of Mrs. Hughes' property interest in post-1889 accretions to her land. He indicated the appropriate line of analysis to be as follows:

> To the extent that the decision of the Supreme Court of Washington on that issue arguably conforms to reasonable expectations, we must of course accept it as conclusive. But to the extent that it constitutes a sudden change in state law, unpredictable in terms of the relevant precedents, no such deference would be appropriate. For a State cannot be permitted to defeat the constitutional prohibition against taking property without due process of law by the simple device of asserting retroactively that the property it has taken never existed at all. Whether the decision here worked an unpredictable change in state law thus inevitably presents a federal question for the determination of this Court.

*Id.* at 296-97.

After a review of relevant Washington case law, Justice Stewart found the *Hughes* decision to be a completely "unforseeable" departure from prior holdings. Moreover, he said:

> There can be little doubt about the impact of that change upon Mrs. Hughes: The beach she had every reason to regard as hers was declared by the state court to be in the public domain. Of course the court did not conceive of this action as a taking. As is so often the case when a State exercises its power to make law, or to regulate, or to pursue a public project, pre-existing property interests were impaired here without any calculated decision to deprive anyone of what he once owned. But the Constitution measures a taking of property not by what a State says, or by what it intends, but by what it *does*. Although the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property — without paying for the privilege of doing so. Because the Due Process Clause of the Fourteenth Amendment forbids such confiscation by a State, no less through its courts than through its legislature, and no less when a taking is unintended than when

it is deliberate . . . .

*Id.* at 297-98.

There is no doubt in my mind that the observations of Justice Stewart in *Hughes* and the *Muhlker* holding are fully applicable to this case. That *McBryde I* is a totally unforeseeable departure from prior cases of this court on the subject of water rights I have demonstrated elsewhere in this opinion. That the private parties to this action have relied considerably on these cases I have likewise indicated. Moreover, the decision in *McBryde I* on the questions of the ownership of surplus water and the transferability of privately owned waters affects the substantial and immediate enjoyment of the appellants' rights, not merely matters which are peripheral to those rights. Compare *Chicago & Alton R.R. v. Tranbarger, supra.*

*McBryde I* may or may not establish a better system for the regulation of water rights than the system that heretofore has evolved in this State. Perhaps government ownership and control of Hawaii's water resources would more effectively serve the public interest than private ownership. If this is so, then it is within the power of the State to appropriate these resources after the payment of reasonable compensation for their value. I cannot agree that it is constitutionally permissible for this court to perform the task without compensating the appellants, based exclusively on the court's perception of what is best as a policy matter for the people of Hawaii.[39]

---

[39] As stated in Miller & Lux v. Madera Canal & Irrig. Co., 155 Cal. 59, 65, 99 P. 502, 512 (1909):

Neither a court nor the Legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public policy is at best a vague and uncertain guide, and no consideration of policy can justify the taking of private property without compensation. If the higher interests of the public should be thought to require that the water usually flowing in streams of this state should be subject to appropriation in ways that will deprive the riparian proprietor of its benefit, the change sought must be accomplished by the use of the power of eminent domain.

*See also* Palmer v. Railroad Comm'n, 167 Cal. 163, 175-76, 138 P. 997, 1001-02 (1914) (statutory declaration that all running water is property of the State cannot operate retroactively to deprive landowners of riparian rights recognized under prior law); Nielson v. Sponer, 46 Wash. 14, 89 P. 155 (1907) (accord).

## V. CONCLUSION

In accordance with the reasoning expressed in this opinion, I would overrule *McBryde I* and hold specifically as follows:

Gay and Robinson, as successor in interest to the *konohiki* of the *ilis kupono* of Manuahi and Koula, is entitled to all the normal surplus water, as defined in note 6 *supra,* of the Manuahi and Koula streams. All of the parties are entitled to the amounts of appurtenant water, as defined in note 4 *supra,* that were awarded by the trial court, except that the finding of the trial court that Gay and Robinson is entitled to appurtenant water rights for 90 acres of land in Koula and Manuahi should be set aside for the reasons expressed by this court in *McBryde Sugar Co. v. Robinson, supra* at 189-90, 504 P.2d at 1340. McBryde is not entitled to any prescriptive water, as defined in note 5 *supra,* for the reason stated by Justice Marumoto in his dissenting and concurring opinion in *McBryde I* that "[i]n the establishment of prescriptive right to water, adverse use does not run upstream." *Id.* at 205, 504 P.2d at 1348. Storm and freshet surplus water, as defined in note 7 *supra,* is to be apportioned between Gay and Robinson, McBryde and the State, as *konohikis* of *ili kupono* and an *ahupuaa* through which the water courses of the Hanapepe Valley flow, according to the principles of riparian law announced in *Carter v. Territory, supra.* Finally, the rights of the various parties to normal surplus water or appurtenant water include the right to make transfers of that water to land both within and without the Hanapepe watershed, so long as the water rights of others are not thereby prejudiced.

Because a majority of this court cannot bring itself to accept the foregoing results as correct and consistent with well-established principles of Hawaiian water law, I dissent.